**Damon SMITH, Plaintiff,**

v.

**James PEFANIS, et al., Defendants.**

**Civil Action No. 1:08–CV–1042–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 31, 2009.

Benjamin Alexander Stone, Thomas J. Munger, Munger & Stone, Atlanta, GA, for Plaintiff.

David C. Ates, David Ates, P.C., Atlanta, GA, for Defendants.

## OPINION AND ORDER

J. OWEN FORRESTER, Senior District Judge.

This matter is before the court on Defendant AME Financial Corporation's motion for partial summary judgment [80]; Plaintiff's motion for contempt sanctions against Ron Eckland, Atlanta Real Estate Law Group, LLC, David Ates, and The Jeffries Group [94]; the Non–Final Report and Recommendation of Magistrate Judge Russell G. Vineyard [116]; Defendants' motions for extension of time [118], [119], and [120]; Defendants' motion for leave to file objections out of time [125]; and Defendants' objections to the Non–Final Report and Recommendation [122].

Plaintiff, Damon Smith, filed suit against Defendants James Pefanis, AME Financial Corporation and Georgia Mutual Mortgage Corporation, on March 17, 2008, alleging he suffered a sexually hostile work environment, sexual harassment resulting in a tangible employment action, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* Plaintiff also asserted state law causes of action of negligent hiring and retention, assault and battery, intentional infliction of emotional distress, and failure to provide plaintiff with a safe work environment in violation of O.C.G.A. § 34–2–10. Defendants moved for summary judgment as to all Plaintiff's claims save for assault and battery.

Magistrate Judge Russell G. Vineyard issued a Report and Recommendation recommending that Defendants' motion for summary judgment be granted in part and denied in part. He recommends denying Defendants' motion as to Plaintiff's

hostile work environment, retaliation, and negligent hiring claims. He recommends granting Defendants' motion as to Plaintiff's claims of intentional infliction of emotional distress and failure to provide plaintiff with a safe work environment in violation of O.C.G.A. § 34–2–10. Magistrate Judge Vineyard also considered Plaintiff's motion for contempt for failure of certain Defendants and non-defendants to comply with the Magistrate Judge's orders as to subpoenas issued by Plaintiff pursuant to Federal Rule of Civil Procedure 45. He certified the facts surrounding the subpoena dispute and recommended that the district court issue a show cause order.

## Motion for Summary Judgment

Plaintiff, an African–American male, worked as an account executive for AME and Georgia Mutual Mortgage Corporation from August 2007 until November 30, 2007. The Report and Recommendation sets forth in great detail the allegations made by Plaintiff to support his sexual harassment claim. This testimony includes direct propositions by Defendant Pefanis, a homosexual, as well as physical touching and rubbing of Plaintiff's body, and simulation of anal sex against Plaintiff's body. The Magistrate Judge concluded that Plaintiff had proffered sufficient evidence to show that Defendant Pefanis's actions were pervasive, severe and "based on sex." (Plaintiff's testimony is similar to that adduced in a case filed by another plaintiff against the same defendants. *See Forsberg v. Pefanis,* Civil Action No. 07–CV–3116–JOF–RGV. In *Forsberg,* Magistrate Judge Vineyard found that Defendant Pefanis's actions were "based on sex" because he harassed females in order to humiliate them and males for sexual gratification. In *Forsberg,* in an order dated March 27, 2009,

the court adopted *inter alia* this portion of the Magistrate Judge's order.)

As to his retaliation claim, Plaintiff testified that after innumerable propositions by Defendant Pefanis, Plaintiff once again strongly rejected Pefanis's advances in the middle of November 2007. Plaintiff was terminated two weeks later. Defendants offered that Plaintiff was terminated for performance reasons because he did not meet his sales quota during the three months he was employed. Defendants further asserted that they had put Plaintiff on a performance improvement plan and warned him that his job was in jeopardy. Plaintiff testified that he was never told by anyone that his performance was deficient. He claims he was never put on a performance improvement plan, and, indeed, none was produced during discovery. He also asserts that his sales numbers met or exceeded the quotas as he understood them. Finally, he testified that at the time of his termination, none of Defendants' employees told him he was being terminated for poor performance, rather they stated that he was being let go because "Pefanis want[ed] him gone" and that he was not a "good fit." Defendants' Human Resources Supervisor, in fact, told Plaintiff she did not agree with the decision to terminate him.

Defendants object to the Report and Recommendation for three reasons.[1] First, Defendants contend that the Magistrate Judge erred in recommending the sexual harassment claim proceed because they argue Defendant Pefanis is an "equal opportunity offender" and therefore his conduct cannot be said to be "based on sex." Second, Defendants contend that the Magistrate Judge erred in recommending that Defendants' motion for summary judgment as to retaliation be denied because there are disputed facts as to the legitimacy of the reasons given for Plaintiff's termination. Finally, Defendants seek the benefit of the "same decision" defense to argue that Plaintiff will not be able to establish back pay or damages because he cannot work for a mortgage company anymore.

With respect to Plaintiff's sexual harassment claim, the court notes that Defendants do not object to the Magistrate Judge's conclusion that Plaintiff set forth sufficient evidence on pervasiveness and severity, but rather only object to the Magistrate Judge's finding that Defendant Pefanis's actions were "based on sex." For the reasons given in the Magistrate Judge's Report and Recommendation, *see* pages 1324-26, the court agrees that Plaintiff has presented sufficient evidence from which a jury could conclude that Defendant Pefanis's actions were "based on sex" and he is not an "equal opportunity offender."

Defendants object to the Report and Recommendation on Plaintiff's retaliation claim arguing only that there was not sufficient evidence from which a jury could conclude that Defendants' reasons for termination were pretextual. The court disagrees. The Magistrate Judge reviewed Plaintiff's ample evidence that job performance was not the real reason for

---

1. Both in the instant matter and the *Forsberg* litigation, Defendants' counsel has filed numerous motions for extensions of time. Often, the motion seeks an extension of one or two days and just prior to the expiration of that time, another motion is filed seeking a similarly short extension. The court notes this practice does not generally aid in judicial economy, but as Plaintiff has yet to be preju-diced by requests for these extensions, the court will grant them. The court, however, makes no comment as to how it might view these motions going forward. The court GRANTS Defendants' motions for extension of time [118], [119], and [120]; and GRANTS Defendants' motion for leave to file objections out of time [125].

Plaintiff's termination, including Plaintiff's testimony that he was never told his job was in danger; he met the sales quotas set out for him by Defendants; he was never placed on a performance improvement plan and none was produced in discovery; and at the time of his termination, he was not told his firing was based on his job performance. This is sufficient evidence from which a reasonable jury could conclude that Defendants' stated reasons for termination were pretextual.

■ Finally, as for Defendants' "same decision" objection, the court notes that the Magistrate Judge found that Defendants waived the defense on summary judgment because they made no argument in their briefs concerning the back pay issue. On this basis alone, the court can reject any notion of the "same decision" defense as Defendants have not previously raised it in the litigation. *See Williams v. McNeil,* 557 F.3d 1287 (11th Cir.2009) (holding district court has discretion to decline to consider party's argument when argument was not presented first to magistrate judge, but rather was first raised in party's objections to magistrate judge's report and recommendation). In any event, Defendants do no better in their objections. Defendants vaguely allude to the fact that Plaintiff cannot be hired to work at a mortgage company without any further explanation. In his response to Defendants' objections, Plaintiff presumes Defendants' argument is based on the fact that many years ago, Plaintiff was convicted of the felony of criminal mischief. However, Defendants were aware of Plaintiff's prior conviction when he was hired, and therefore, they cannot claim the benefit of the "same decision" defense.

## Motion for Contempt

Plaintiff moves for civil and criminal contempt sanctions pursuant to Federal Rule of Civil Procedure 45(e) and 18 U.S.C. § 401 against non-parties Ron Eckland; Atlanta Real Estate Law Group, LLC; The Jeffries Group, financial accountants; and David Ates, Defendants' attorney, based on their failure to comply with the October 30, 2008, order of the Magistrate Judge directing them to produce any and all documents responsive to the August 11, 2008, Rule 45 subpoenas. In his Report and Recommendation, the Magistrate Judge reviews the materials he directed to be produced pursuant to these subpoenas. *See* Report and Recommendation, at 1336-38. He then discusses the parties' briefs as to the motion for civil and criminal contempt, as well as a hearing held before the Magistrate Judge on January 27, 2009. *Id.* at 1338-41. Based on his review of this procedural and factual history, the Magistrate Judge concluded that Plaintiff sufficiently established a *prima facie* case that Eckland, the Atlanta Real Estate Law Group, LLC, The Jeffries Group, and David Ates failed to comply with the Court's October 30, 2008, order. Therefore, he recommends that the district court issue an order directing them to show cause as to why they should not be adjudged in contempt. The Magistrate Judge did not recommend that criminal contempt sanctions be applied. *See id.* at 1342 n. 23. But for a fleeting reference in a footnote, Defendants did not object to this portion of the Magistrate Judge's Report and Recommendation.

Pursuant to 28 U.S.C. § 636(e)(6)(B)(iii), in such cases where the district judge has assigned pretrial matters to the magistrate judge and acts pertaining to these matters are deemed to constitute civil contempt:

the magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be

held in contempt by reason of the facts so certified.

*Id.* The court agrees with the recommendation of the Magistrate Judge that Eckland, the Atlanta Real Estate Law Group, LLC, The Jeffries Group, and David Ates should show cause as to why civil contempt sanctions should not be entered against them for failure to comply with the October 30, 2008, order of Magistrate Judge Russell G. Vineyard.

### Conclusion

In sum, the court ADOPTS the Report and Recommendation of the Magistrate Judge as the ORDER of this court. The court GRANTS IN PART AND DENIES IN PART Defendants' motion for partial summary judgment [80]. The claims remaining in the case are sexual harassment and retaliation in violation of Title VII, negligent retention and hiring, and assault and battery.

The court agrees with the Magistrate Judge's recommendation that sufficient evidence exists for the court to issue a show cause order as to why Ron Eckland; Atlanta Real Estate Law Group, LLC; The Jeffries Group, financial accountants; and David Ates should not be found in contempt. The court DIRECTS Plaintiff and Ron Eckland, Atlanta Real Estate Law Group, LLC, The Jeffries Group, and David Ates, to appear in Courtroom 1905 on Wednesday, September 30, 2009, at 10:30 a.m. for a hearing on the motion for contempt [94].

The court GRANTS IN PART AND DENIES IN PART Defendant AME Financial Corporation's motion for partial summary judgment [80]; ADOPTS the Non–Final Report and Recommendation of Magistrate Judge Russell G. Vineyard [116] as the ORDER of this court; GRANTS Defendants' motions for extension of time [118], [119], and [120]; GRANTS Defendants' motion for leave to file objections out of time [125]; and REJECTS Defendants' objections to the Report and Recommendation [122].

### *MAGISTRATE JUDGE'S NON–FINAL REPORT, RECOMMENDATION, AND ORDER*

RUSSELL G. VINEYARD, United States Magistrate Judge.

Plaintiff Damon Smith brings this employment discrimination action against James Pefanis ("Pefanis"), AME Financial Corporation ("AME"), and Georgia Mutual Mortgage Corporation ("Georgia Mutual"),[1] alleging he suffered a sexually hostile work environment, sexual harassment resulting in a tangible employment action, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* [Doc. 1 ¶¶ 39–43, 59–62]. Plaintiff also asserts state law claims of negligent hiring and retention, assault and battery, intentional infliction of emotional distress, and failure to provide plaintiff with a safe working environment in violation of O.C.G.A. § 34–2–10. [*Id.* ¶¶ 44–58]. Defendants have moved for partial summary judgment as to all of plaintiff's claims except his claim for assault and battery, [Doc. 80],[2] which plaintiff opposes, [Doc.

---

1. Pefanis, AME, and Georgia Mutual are hereinafter collectively referred to as defendants.

2. In their motion, defendants state they also seek summary judgment on plaintiff's claim for back pay. [Doc. 80 at 2]. However, defendants have made no argument in their brief in support of summary judgment regarding the back pay claim. [*See* Doc. 80–2]. Thus, the

Court will not address this issue since defendants failed to offer any argument and are therefore deemed to have abandoned it. *Cheffer v. Reno,* 55 F.3d 1517, 1519 n. 1 (11th Cir.1995) (finding issue abandoned even though party's brief listed the issue in the statement of issues because party provided no argument on the merits of the claim in their brief). *See also Bronson v. Swensen,* 500 F.3d

83]. For the reasons set forth herein, it is **RECOMMENDED** that defendants' motion, [Doc. 72], be **GRANTED** in part and **DENIED** in part.[3] Plaintiff has filed a motion for civil and criminal contempt and for sanctions, [Doc. 94], against Ron Eckland ("Eckland"), Atlanta Real Estate Law Group, LLC, ("ARELG"), attorney David Ates ("Ates"), and the Jeffries Group ("Jeffries"), which Eckland, ARELG, and Ates oppose, [Doc. 97].[4] For the reasons

1099, 1105 (10th Cir.2007) (concluding that a party's "cursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary" to merit consideration by the court); *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir.1996) (issues which are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

3. In connection with their summary judgment motion, defendants filed a motion for leave to file summary judgment exhibits one-day out of time, [Doc. 81], which plaintiff opposes, [Doc. 83–2 at 2–5]. Plaintiff, however, also cites to some of defendants' exhibits in support of their statement of material facts that present a genuine issue for trial. [Doc. 83–3 ¶¶ 1, 89, 93]. Because defense counsel mistakenly believed that he had timely filed the exhibits and plaintiff has not been prejudiced by the one-day delay, the Court **GRANTS** defendants' motion, [Doc. 81].

4. Defendants have also filed a motion to compel, [Doc. 109], seeking disclosure of witnesses who allegedly provided information that defendants paid substantial sums of money to Farah Bowers in exchange for favorable testimony. Defendants filed this same motion in the *Forsberg* case, [Civil Action No.: 1:07–cv–3116, Doc. 120], and motions in that case have been set for a hearing before the District Court, [*id.* at Doc. 134]. Accordingly, the pending motion to compel, [Doc. 109], will not be addressed herein.

5. The facts in this case are strongly disputed. "However, for purposes of this motion, when facts are in dispute the court must assume that any admissible evidence proffered by the plaintiff is true, and must also draw all reasonable inferences from the evidence in the

stated herein, it is **RECOMMENDED** that plaintiff's motion, [Doc. 94], be **GRANTED** in part and **DENIED** in part.

## I. FACTUAL BACKGROUND

Plaintiff, an African–American male, worked as an account executive for AME and Georgia Mutual from August 2007 until November 30, 2007. [Doc. 80–3 ¶¶ 6, 71; Doc. 83–3 ¶ 1; Doc. 81–5 (Abbott Decl.) ¶ 4].[5] AME and Georgia Mutual are

plaintiff's favor." *Heller v. Columbia Edgewater Country Club*, 195 F.Supp.2d 1212, 1216 (D.Or.2002). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). With this in mind, in connection with their motion and as required by Local Rule 56.1(B), defendants have submitted a statement of facts showing no genuine issues to be tried, [Doc. 80–3], to which plaintiff has responded, [Doc. 83–2]. Plaintiff also submitted his own statement of material facts which he contends present a genuine issue for trial, [Doc. 83–3], to which defendants have responded, [Doc. 90–2]. With regard to some of defendants' statements of facts, [Doc. 80–3], they either were not supported by a citation to evidence, including page or paragraph number, or were not supported by the citation provided in violation of Local Rule 56.1B(1). Nevertheless, the Court accepts as undisputed those facts which the parties admit. [*See* Doc. 83–2, admitting ¶¶ 2–5, 13 (defendants actually listed two paragraphs with the number 13 and plaintiff admits both paragraphs), 41–42, 52, 56–59, 65–66, 75–79, 86–89, 91, 93, 95, and parts of ¶¶ 1, 6–7, 9, 25, 30, 43–44, 47–48, 54, 60–62, 67, 71–74, 80–85, 90, 92, and 94 of defendants' statement, Doc. 80–3; Doc. 90–2, admitting ¶¶ 1, 3–6, 8, 10, 12–28, 31–49, 51–94, 96, and parts of ¶¶ 2, 7, 29–30, and 95 of plaintiff's statement, Doc. 83–3]. The Court, however, has omitted certain facts which are not material to the issues presented in the pending motion, were stated as an issue or legal conclusion, or were not supported by citations to evidence. *See* Local R. 56.1B(1), (2)(iii), N.D. Ga. Moreover, defendants attempt to rely on the affidavit of Jennifer Walter in support of their statement of facts numbers 16 through 19 and the affidavit of Raquel McClendon for their statement of facts numbers 20 through 24, [Doc. 80–3 ¶¶ 16–19, 20–

in the business of providing mortgage brokerage services. [Doc. 1 ¶¶ 6–7]. Pefanis is the Chief Executive, Financial Officer, and co-owner of AME and Georgia Mutual. [Doc. 1 ¶ 5; Doc. 83–3 ¶¶ 2–3; *Forsberg* Doc. 73–4 (Forsberg Decl.) ¶ 6; *Forsberg* Doc. 73–5 (Brown Decl.) ¶ 2]. Plaintiff reported to Robert Anderson ("Anderson"), AME's Wholesale Manager. [Doc. 80–3 ¶ 7; Doc. 81–4 (Martin Decl.) ¶ 5; Doc. 81–15 (Anderson Decl.) ¶ 2]. After working at AME for several weeks, plaintiff was transferred from outside sales to the inside sales department. [Doc. 80–3 ¶ 8; Doc. 115 (Pl.'s Dep.) at 295–96, 336–37].[6]

 Plaintiff alleges that Pefanis engaged in objectionable behavior of a racial and sexual nature before and during plaintiff's employment at AME and Georgia Mutual. [Doc. 83–3 ¶ 2; *Forsberg* Doc. 73–4 ¶¶ 7, 22–23; *Forsberg* Doc. 73–5 ¶¶ 4–7; *Forsberg* Doc. 73–6 (Cross Decl.) ¶¶ 8–17; *Forsberg* Doc. 73–7 (Felion Decl.) ¶¶ 3–7]. For example, plaintiff claims that prior to his employment, Pefanis, who is homosexual, sexually harassed numerous male and female employees in the presence of AME management, including kissing employees, repeatedly grabbing and groping the genitalia and other private body parts of male and female employees, exposing his genitalia to employees, telling employees he wanted to have sex with them, thrusting his crotch into employees' backsides, and on at least one occasion, forcibly taking off a male employee's pants and sticking his finger in the employee's anus. [Doc. 83–3 ¶¶ 5–6, 8; *Forsberg* Doc. 73–4 ¶¶ 6–20; *Forsberg* Doc. 73–6 ¶¶ 8–13, 15–17; *Forsberg* Doc. 73–7 ¶¶ 3–5, 7; Doc. 73–5 ¶¶ 4–7]. Plaintiff claims that because Pefanis is homosexual, he harasses males and females for different purposes. [Doc.

24], to which plaintiff objects, [Doc. 83–2 ¶¶ 16–19, 20–24]. Because defendants failed to disclose Jennifer Walter or Raquel McClendon as persons likely to have discoverable information pursuant to Federal Rule of Civil Procedure 26, [*see* Doc. 7], the Court **SUSTAINS** plaintiff's objections and declines to consider these affidavits in ruling on defendants' partial summary judgment motion. *Kramer v. Gwinnett County, Ga.,* 306 F.Supp.2d 1219, 1224–25 (N.D.Ga.2004) (striking plaintiff's affidavit where witness was not identified in plaintiff's response to defendant's discovery requests or in plaintiff's initial disclosures). *See also Dogan–Carr v. Saks Fifth Ave. Texas, LP,* Civil Action No. H–05–1236, 2007 WL 646375, at *19 (S.D.Tex. Feb. 26, 2007) (striking plaintiff's affidavit because plaintiff "failed to disclose [affiant] as a person with knowledge of relevant facts and now attempts to rely on her affidavit testimony, without having afforded [defendant] the opportunity to depose [affiant] before the end of the discovery period"). Finally, plaintiff relies on certain affidavits submitted as exhibits in opposition to a summary judgment motion filed in another case involving the same defendants. *See Forsberg v. Pefanis,* Civil Action No. 1:07–cv–3116–JOF–RGV. Any documents referenced in this case that were filed in the *Forsberg* case will be referred to as "[*Forsberg*, Doc. ____]."

6. Defendants contend that plaintiff was transferred from outside sales to the inside sales department managed by Brian Abbott ("Abbott") because they determined that plaintiff would benefit from more "hands-on" training and mentoring after having been counseled by Anderson to improve his sales numbers. [Doc. 80–3 ¶¶ 8–9, 13; Doc. 81–5 ¶¶ 2, 5; Doc. 81–4 ¶ 7]. Specifically, defendants contend that several areas of concern with regard to plaintiff began to develop, including that he would disappear for hours at a time without notifying management of any prior appointments, he failed to grasp some of the basic knowledge required to perform his position, and was unable to meet production quotas set forth at the beginning of his employment. [Doc. 80–3 ¶¶ 8, 12; Doc. 81–5 ¶¶ 6–7, 9–12; Doc. 81–4 ¶ 12]. Plaintiff, however, disputes these contentions, arguing that he was actually transferred to an inside sales position partly because AME hired another employee to take over the outside account executives. [Doc. 83–2 ¶ 9; Doc. 115 at 259–60, 342]. Plaintiff further points out that Anderson remained plaintiff's supervisor at all times during his employment with AME. [Doc. 83–2 ¶ 9; Doc. 115 at 338].

83–3 ¶¶ 4, 7; *Forsberg* Doc. 73–4 ¶ 7]. Specifically, plaintiff claims that Pefanis sexually harasses males for his sexual gratification, whereas he sexually harasses females to demean, degrade, and subordinate them. [Doc. 83–3 ¶¶ 4, 7; *Forsberg* Doc. 73–4 ¶ 7].[7] Pefanis reportedly told employees at a meeting in April 2008 that if they did not like his conduct in the workplace, "there's the door and you can go f___ yourself." [Doc. 83–3 ¶ 10; *Forsberg* Doc. 73–7 ¶ 10].

After defendants hired plaintiff and he had already started working at AME, Pefanis learned from a background check that plaintiff previously had drug charges filed against him that were ultimately dismissed, and also learned from plaintiff that he had been convicted of the felony of criminal mischief as a teenager when he fired a gun at a car. [Doc. 80–3 ¶¶ 59, 67, 70, 92; Doc. 83–3 ¶ 49; Doc. 115 at 94–97, 309–10, 313, 318, 323–24].[8] Plaintiff offered to provide two other background checks that had been performed by prior prospective employers that did not include the felony charge. [Doc. 80–3 ¶ 93; Doc. 115 at 321]. Pefanis agreed to keep one of those prior reports in plaintiff's file and to retain plaintiff, but repeatedly told him, "Don't forget what I did for you, you little

drug dealer." [Doc. 80–3 ¶¶ 93, 95; Doc. 83–3 ¶ 51; Doc. 115 at 321, 324–27]. Plaintiff complains that on his second day of employment, Pefanis began directing sexually inappropriate conduct toward him. [Doc. 83–3 ¶ 12; Doc. 115 at 225–31]. Specifically, plaintiff claims that during his employment, Pefanis sexually propositioned him on at least four occasions, making statements such as, "Are we going to have sex or not?" and "Let's do it," and inappropriately touched him on more than five occasions. [Doc. 80–3 ¶¶ 90–91; Doc. 83–3 ¶¶ 47–48; Doc. 115 at 303–10].

Plaintiff also claims that in the presence of his direct supervisor, Anderson, Pefanis embarrassed and offended him by stating, "You're gay aren't you?," and commenting that, based on plaintiff's style of shoes, "he has to be gay." [Doc. 80–3 ¶ 72; Doc. 83–3 ¶ 13; Doc. 115 at 225–31]. During this time, plaintiff claims he also observed Pefanis make numerous sexually inappropriate and crude comments about other male employees, such as announcing they have a "nice butt," and parading a male employee around the office stating, "Does this look like a 40-year old butt?" [Doc. 80–3 ¶ 79; Doc. 83–3 ¶¶ 14, 17; Doc. 115 at 232–33, 247–48].

---

**7.** Plaintiff also alleges that Pefanis referred to African–Americans in the office as "niggers," "nappy headed nigger," and made statements such as "Daddy's in the big house, and I need my coloreds around me." [Doc. 83–3 ¶ 95; *Forsberg* Doc. 73–4 ¶¶ 5, 22; *Forsberg* Doc. 73–5 ¶ 3; *Forsberg* Doc. 73–7 ¶ 6; *Forsberg* Doc. 73–6 ¶¶ 5–6], which may be relevant to the overall hostility at AME. *Brantley v. City of Macon,* 390 F.Supp.2d 1314, 1324–25 (M.D.Ga.2005) ("Remarks and conduct targeted at others 'may contribute to the overall hostility of the working environment.' A plaintiff 'may also support a claim of hostile work environment by the use of harassing conduct [he] learned of through hearsay, so long as [he] was aware of the harassing incidents at the relevant time at which [he] alleges [he] experienced the hostile environ-

ment.' ") (citation omitted); *Cardin v. VIA Tropical Fruits, Inc.,* No. 88–14201–CIV–MARCUS, 1993 WL 945324, at *10 n. 8 (S.D.Fla. July 9, 1993) (*citing Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416–17 (10th Cir.1987) ("holding that trial court may aggregate evidence of racial hostility with evidence of sexual hostility to determine whether there was a pervasive discriminatory atmosphere")).

**8.** AME's application for employment requested disclosure of any felony conviction and plaintiff admits that he intentionally omitted his felony conviction on his AME application because he "didn't want to disclose that information" and did not want anything to happen to his job prospect at AME. [Doc. 80–3 ¶ 66; Doc. 83–2 ¶ 62; Doc. 115 at 159–61].

According to plaintiff, Pefanis made such sexual comments to and/or about other employees in his presence on a daily basis and would frequently talk about sex in the office. [Doc. 83–3 ¶¶ 15–16; Doc. 115 at 251–52, 259]. In fact, plaintiff claims that during his entire 90–day period of employment with AME, he witnessed Pefanis engage in sexually offensive conduct on at least fifty occasions. [Doc. 80–3 ¶ 83; Doc. 115 at 261–62]. For example, Pefanis allegedly told plaintiff that he had sex with Anderson and Anderson had a small penis, and he wished it was bigger. [Doc. 80–3 ¶ 77; Doc. 83–3 ¶¶ 25–26; Doc. 115 at 242–43, 245–46]. Plaintiff claims Pefanis repeatedly asked him if he had a big penis. [Doc. 83–3 ¶ 63; Doc. 83–4 at 6]. Pefanis allegedly engaged in this behavior on numerous occasions in front of his management team, including his Human Resources Manager Phyllis Lee ("Lee"). [Doc. 83–3 ¶ 19; Doc. 115 at 234].

According to plaintiff, Pefanis also began to physically touch him. For example, Pefanis would sit next to plaintiff, place his hands on plaintiff's thigh, and repeatedly rub his hands back and forth on plaintiff's thigh. [Doc. 80–3 ¶ 74; Doc. 83–3 ¶¶ 21–22; Doc. 115 at 239–42]. Pefanis would also make statements to plaintiff while touching him such as "You know you're my little drug dealer. You know I did this for you. Don't forget what I did for you," "We should have sex," and "I will make sure you enjoy it." [Doc. 83–3 ¶¶ 52, 62; Doc. 115 at 324–25; Doc. 83–4 at 6–7]. The first time Pefanis engaged in this type of behavior, plaintiff told Pefanis that he was married and not gay. [Doc. 80–3 ¶ 75; Doc. 83–3 ¶ 23; Doc. 115 at 241–42]. Thereafter, plaintiff repeatedly told Pefanis that he was not gay, but Pefanis' conduct continued. [Doc. 83–3 ¶ 24; Doc. 115 at 242–43].

On one occasion, plaintiff was in Anderson's office when Pefanis walked into the office, rubbed his body against plaintiff's body, and stated "I got two tall handsome black guys in my office. You know I want both of you together." [Doc. 80–3 ¶ 84; Doc. 83–3 ¶¶ 31–32; Doc. 115 at 262–65]. Plaintiff, who was humiliated, left the office. [Doc. 83–3 ¶ 34; Doc. 115 at 264]. Anderson later told plaintiff that Pefanis should not have said that and apologized on Pefanis' behalf for his conduct. [Doc. 80–3 ¶ 84; Doc. 83–3 ¶ 35; Doc. 115 at 265–68]. He also advised plaintiff that he had talked to Pefanis on more than one occasion about Pefanis' conduct. [Doc. 83–3 ¶ 36; Doc. 115 at 267]. Plaintiff told Anderson that apologizing to him for Pefanis' conduct was not a satisfactory answer to the conduct. [Doc. 83–3 ¶ 38; Doc. 115 at 265]. Thereafter, plaintiff reported this incident to Human Resources Manager Lee to no avail. [Doc. 83–3 ¶ 39; Doc. 115 at 266].

On another occasion, plaintiff attended a closed-door team meeting with Pefanis, Anderson, and Inside Sales Manager Sean Martin. [Doc. 80–3 ¶ 5; Doc. 83–3 ¶ 40; Doc. 115 at 251–54; Doc. 81–4 ¶ 1]. According to plaintiff, at the beginning of the meeting, Pefanis stated, "Does anyone have a penis I can put in my mouth?" [Doc. 80–3 ¶ 80; Doc. 83–3 ¶ 40; Doc. 115 at 251–54]. Additionally, at a birthday luncheon for an AME employee, Pefanis spoke about a sex toy and then turned to plaintiff and stated, "Do you even like sex?" [Doc. 83–3 ¶¶ 43–44, 46; Doc. 115 at 332; Doc. 68 (Pefanis Dep.) at 74–75]. During this same luncheon, Pefanis also referenced a sushi roll that had been served and told plaintiff, "If you like sex you are going to like that roll." [Doc. 80–3 ¶ 38; Doc. 83–3 ¶ 45; Doc. 68 at 74]. On another occasion, Pefanis allegedly asked plaintiff if he was going to have sex with him and again reminded him of the favor he had done for his "little drug dealer." [Doc. 83–3 ¶ 53; Doc. 115 at 323–31]. Ac-

cording to plaintiff, he declined Pefanis' advances, and Pefanis again stated, "Don't forget the favor I have done for you." [Doc. 83–3 ¶ 54; Doc. 115 at 323–31].

In a separate incident, plaintiff claims that Pefanis approached him in a hallway, grabbed plaintiff from behind, forced himself against plaintiff with his pelvic area, pressing his crotch against plaintiff's buttocks, simulating anal sex. [Doc. 80–3 ¶ 84; Doc. 83–3 ¶ 55; Doc. 115 at 269–72]. Plaintiff used his elbow to push Pefanis away and said, "Get off of me!" [Doc. 83–3 ¶ 55; Doc. 115 at 272]. According to plaintiff, Lee witnessed the incident and later pulled plaintiff aside and apologized for Pefanis' conduct. [Doc. 80–3 ¶ 85; Doc. 83–3 ¶¶ 57–58; Doc. 115 at 272–73]. Lee stated that she wished she could do something, but that her "job is on the line just as yours is." [Doc. 83–3 ¶¶ 59, 74; Doc. 115 at 273]. Lee further stated, "What can I do? I am his employee." [Doc. 83–3 ¶ 59; Doc. 115 at 273].

In addition to the previous incidents, Pefanis, on one occasion, reached from behind plaintiff during a team meeting, and, in the presence of other employees, rubbed plaintiff's chest. [Doc. 80–3 ¶ 91; Doc. 83–3 ¶ 60; Doc. 115 at 309–10]. Pefanis also smacked plaintiff on the buttocks during another incident and stated, "Nice ass. Let's try it." [Doc. 80–3 ¶ 86; Doc. 83–3 ¶ 61; Doc. 83–4 at 6]. Whenever plaintiff had to enter Pefanis' office, Pefanis would ask plaintiff to lock his door while plaintiff was in the office "so that no one would see." [Doc. 83–3 ¶ 64; Doc. 83–4 at 7]. Pefanis' actions and conduct disgusted and offended plaintiff, and plaintiff informed Pefanis that he was offended, but Pefanis ignored plaintiff and continued his actions toward him. [Doc. 83–3 ¶¶ 65–66; Doc. 83–4 at 7].

AME's sexual harassment policy instructed its employees to report any harassment to Pefanis as AME's Chief Financial Officer. [Doc. 83–3 ¶ 68; Doc. 83–4 at 9]. Plaintiff claims that Pefanis' actions were often witnessed by AME's management team, including Anderson and Lee. [Doc. 83–3 ¶ 67; Doc. 115 at 256]. Therefore, plaintiff did not believe there was any reason to report Pefanis' conduct. [Doc. 83–3 ¶ 67; Doc. 115 at 256]. Nevertheless, plaintiff repeatedly reported Pefanis' conduct to at least three different members of AME's management team, including Anderson, Lee, and Abbott. [Doc. 80–3 ¶ 81; Doc. 83–3 ¶ 69; Doc. 115 at 256–59]. Specifically, plaintiff asked Anderson to do something about Pefanis' conduct, but Anderson stated, "that's just Jim," and made it clear that plaintiff would just have to tolerate Pefanis' actions if he wanted to continue to work at AME. [Doc. 83–3 ¶ 70; Doc. 83–4 at 4–5]. Plaintiff also had lengthy conversations with Lee about Pefanis' conduct. [Doc. 83–3 ¶ 71; Doc. 115 at 258]. When plaintiff first complained to Lee within weeks of beginning his employment, Lee also stated, "That's just Jim. He has always been like that." [Doc. 83–3 ¶ 72; Doc. 83–4 at 4]. Lee likewise made it clear that plaintiff would just have to tolerate Pefanis' conduct. [Doc. 83–3 ¶ 73; Doc. 83–4 at 4].

Finally, plaintiff alleges that approximately two weeks prior to his termination from his employment with AME, an incident occurred in Anderson and Lee's presence. [Doc. 83–3 ¶ 75; Doc. 115 at 292–94]. Plaintiff was discussing a business issue with Anderson when Pefanis approached plaintiff, looked him in the eye, and stated, "Are we going to have sex or what?" [Doc. 80–3 ¶ 86; Doc. 83–3 ¶ 76; Doc. 115 at 293]. Plaintiff replied, "No" and immediately left the office building. [Doc. 83–3 ¶ 76; Doc. 115 at 293].

The following day, plaintiff returned to work and Anderson approached him and asked him to have lunch with him that day. [Doc. 80–3 ¶ 87; Doc. 83–3 ¶ 78; Doc. 115

at 293–94]. During lunch, Anderson informed plaintiff that while he was doing a good job and his numbers looked good, "Pefanis wants you gone." [Doc. 80–3 ¶ 87; Doc. 83–3 ¶¶ 77, 79, 91; Doc. 115 at 293–96]. Anderson also advised plaintiff that he should "stay the course" and "keep doing what you're doing." [Doc. 80–3 ¶ 87; Doc. 83–3 ¶ 80; Doc. 115 at 295]. Anderson did not give plaintiff a specific reason that Pefanis wanted him gone, and admitted that Pefanis had no reason to let him go. [Doc. 83–3 ¶ 80; Doc. 115 at 295].

A few days later, on November 30, 2007, Abbott approached plaintiff and asked to speak with him. [Doc. 83–3 ¶ 81; Doc. 115 at 336; Doc. 81–5 ¶ 15]. At this time, Abbott advised plaintiff "we're actually letting you go today," and said, "sorry things did not work out," but "everybody is not a good fit." [Doc. 83–3 ¶ 82; Doc. 115 at 337]. Abbott did not specifically provide plaintiff with a reason for his termination other than he was "not a good fit." [Doc. 83–3 ¶ 83; Doc. 115 at 337]. Abbott did state that he wanted plaintiff to "ramp up," meaning increase his sales quota, and plaintiff responded by pointing out that he had been on target with his numbers the entire time he had been with AME. [Doc. 83–3 ¶ 84; Doc. 115 at 337].[9] Abbott acknowledged that plaintiff had reached his

target goals while at AME, but stated that he wished plaintiff had done more. [Doc. 83–3 ¶ 84; Doc. 115 at 337]. After this conversation, plaintiff packed up his things and left the office building. [Doc. 83–3 ¶ 84; Doc. 115 at 337].[10]

After his termination, plaintiff spoke with Lee. [Doc. 83–3 ¶ 85; Doc. 83–4 at 11]. Lee told plaintiff that she did not agree with the decision to terminate him, and that she did not even know about the decision until defendants had already terminated him. [Doc. 83–3 ¶ 86; Doc. 83–4 at 11]. In December 2007, plaintiff also communicated with Anderson in order to request a letter of recommendation, which Anderson provided for plaintiff. [Doc. 83–3 ¶ 87; Doc. 83–4 at 11; Doc. 81–15 ¶¶ 60–62]. Thereafter, on March 17, 2008, plaintiff filed the instant action against defendants.

## II. DISCUSSION

### A. *Defendants' Motion for Partial Summary Judgment*

Plaintiff contends that he endured a hostile work environment because he was sexually harassed by Pefanis, the co-owner of AME and Georgia Mutual. [Doc. 83 at 8; Doc. 1 ¶¶ 39–43]. He further contends that he suffered a tangible employment

---

9. Plaintiff contends that AME's quota for him was to aim at over $1 million in sales, and that he met his sales quota while employed by AME as evidenced by the commission he received. [Doc. 80–3 ¶¶ 88–89; Doc. 83–3 ¶¶ 88–90; Doc. 81–15 ¶¶ 7, 34; Doc. 115 at 295–96]. Defendants dispute that plaintiff met his quota while employed and actually contends that his quota was much higher than the $1 million mark asserted by plaintiff. [Doc. 83–3 ¶¶ 92–93; Doc. 115 at 295–300 & Ex. 12; Doc. 81–15 ¶¶ 37–42].

10. Defendants contend that plaintiff was counseled on numerous occasions that he needed to improve his sales numbers, and that he never reached his minimum quota. [Doc. 80–3 ¶ 10; Doc. 81–4 ¶ 11]. In fact,

they contend that they gave plaintiff a verbal warning that if his production did not improve, he would be terminated. [Doc. 80–3 ¶ 11; Doc. 81–4 ¶ 10]. Defendants further contend that they gave plaintiff a performance improvement plan to help improve his sales, but that he did not follow the plan and that he was subsequently terminated for failing to meet performance requirements. [Doc. 80–3 ¶¶ 14–15; Doc. 81–5 ¶¶ 13–15]. Plaintiff disputes that he was ever counseled about any performance problems while employed at AME, and points out that defendants have failed to produce any such performance improvement plan because he was never given one. [Doc. 80–3 ¶ 88; Doc. 83–3 ¶ 88; Doc. 83–2 ¶ 14; Doc. 115 at 295–96, 336–37].

action when he was terminated from his employment with AME as a result of Pefanis' alleged sexual harassment. [Doc. 83 at 8; Doc. 1 ¶¶ 32, 39–43]. Plaintiff also alleges that defendants retaliated against him by terminating his employment for engaging in protected activity by opposing defendants' violations of Title VII. [Doc. 1 ¶¶ 60–61]. Finally, plaintiff alleges that defendants negligently hired and/or retained Pefanis with knowledge of Pefanis' practices of sexual harassment and assault and battery, intentionally inflicted emotional distress, and failed to provide him with a safe working environment in violation of O.C.G.A. § 34–2–10. [*Id.* ¶¶ 45, 54, 57]. Defendants seek summary judgment on all of plaintiff's claims other than his claim of assault and battery. [Doc. 80–2]. The Court will address the merits of defendants' motion with regard to each of these claims.

### 1. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material facts, upon which the non-moving party must then submit specific facts showing a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial[,]" summary judgment should be granted. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. In ruling on a motion for summary judgment, the Court views all evidence in the light most favorable to and makes all reasonable inferences in the favor of the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Knight v. Baptist Hosp. of Miami, Inc.,* 330 F.3d 1313, 1316 (11th Cir.2003).

### 2. Title VII Claims

#### a. *Sexual Harassment*

 "Title VII prohibits sex-based discrimination that alters the terms and conditions of employment." *Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship,* 490 F.3d 1302, 1308 (11th Cir.2007). "Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as 'hostile work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as 'quid pro quo' harassment)." *Johnson v. Booker T. Washington Broad. Serv., Inc.,* 234 F.3d 501, 508 (11th Cir.2000). *See also Cotton v. Cracker Barrel Old Country Store, Inc.,* 434 F.3d 1227, 1231 (11th Cir.2006). *See generally Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 751–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (noting that the terms *"quid pro quo"* and "hostile work environment" retain limited utility in "making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether").[11] "An employer accused of

---

11. "[T]he Supreme Court in [*Ellerth*], instructed that the term quid pro quo should no longer be used and the courts now use the term tangible employment action to refer to harassment that culminates in a discharge, demotion, or undesirable reassignment." *Beasley v. Wal–Mart Stores East, L.P.,* Civil

Action No. 05–0620–KD–B, 2006 WL 3449144, at *9 n. 7 (S.D.Ala. Nov. 29, 2006) (*quoting Hulsey v. Pride Rests., LLC,* 367 F.3d 1238, 1245 (11th Cir.2004)) (internal marks omitted). Although the Eleventh Circuit in has interpreted *Ellerth* as "largely wip[ing]

quid pro quo harassment will be vicariously liable per se, and will not be permitted to assert an affirmative defense if the tangible employment action resulted from his sexual harassment." *Donaldson v. CDB, Inc.*, Civil Action No. 2:07CV122–KS–MTP, 2008 WL 2704829, at *5 (S.D.Miss. July 8, 2008). "An employer accused of hostile work environment harassment will also be held vicariously liable unless he can prove both prongs of the *Ellerth/Faragher* defense...."[12] *Id.* Here, plaintiff relies on both forms to support his sexual harassment claim. Defendants only challenge whether plaintiff has established a *prima facie* case of hostile work environment and make no argument with regard to plaintiff's tangible employment action claim.

### i. Hostile Work Environment

■ In order to establish a *prima facie* case of hostile work environment sexual harassment, plaintiff must show: (1) he belongs to a protected group; (2) he was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon his sex; (4) the harassment complained of was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) the employer "knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275, 1278 (11th Cir.2002) (*citing Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir.2000)). *See also Criswell v. Intellirisk Mgmt. Corp.*, 286 Fed.Appx. 660, 661–62 (11th Cir.2008) (unpublished); *Jones v. City of Lakeland*, 318 Fed.Appx. 730, 734–35 (11th Cir.2008) (unpublished). On summary

judgment, defendants dispute only the third and fourth elements. [Doc. 80–2 at 5–13].

### (a) Based on Sex

Defendants argue that the alleged harassment was not directed at plaintiff because of his sex since plaintiff alleges that Pefanis allegedly harassed both male and female employees. [Doc. 80–2 at 5–6; Doc. 90 at 2–6]. Specifically, plaintiff's evidence shows that Pefanis repeatedly grabbed and groped the genitalia and other private body parts of both male and female employees. [*Forsberg* Doc. 73–4 ¶¶ 7, 18; *Forsberg* Doc. 73–7 ¶¶ 4–5; *Forsberg* Doc. 73–6 ¶ 13; *Forsberg* Doc. 73–5 ¶ 4]. Therefore, defendants contend that plaintiff cannot show that any alleged harassment he suffered was based on his sex. The Court disagrees.

■ "Harassment is not 'automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Petcou v. C.H. Robinson Worldwide, Inc.*, Civil Action File No. 1:06–CV–2157–HTW–GGB, 2008 U.S. Dist. LEXIS 8885, at *23 (N.D.Ga. Feb. 5, 2008) (*quoting Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). *See also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir.2007). In fact, "what matters is whether the harassment that is visited upon members of different races or gen-

---

out the usefulness of the terms 'hostile environment' and '*quid pro quo*,'" *Johnson*, 234 F.3d at 508 n. 7, the terms remain in use and retain some utility. *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1199 (11th Cir.2001).

**12.** *See Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

ders is truly equal in terms of . . . prevalence, severity and impact." *Wentworth v. Hedson,* 493 F.Supp.2d 559, 568 (E.D.N.Y. 2007). "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination [on the basis of sex]." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998 (internal marks omitted); *see also Petcou,* 2008 U.S. Dist. LEXIS 8885, at *23–24. Therefore, Title VII is only concerned with " 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Givens v. Chambers,* 548 F.Supp.2d 1259, 1279 (M.D.Ala.2008) (*quoting Baldwin,* 480 F.3d at 1302).

■ Courts have found that harassing conduct that is equally offensive to male and female employees or that is inflicted on both sexes is not harassment based on sex. *Holman v. Indiana,* 211 F.3d 399, 403 (7th Cir.2000); *Henson v. City of Dundee,* 682 F.2d 897, 904, 905 n. 11 (11th Cir.1982); *Myers v. Office Depot, Inc.,* No. 06–CV–11252, 2007 WL 2413087, at *4 (E.D.Mich. Aug. 21, 2007); *Donlow v. SBC Commc'ns, Inc.,* No. 05–C–0548, 2006 WL 1479548, at *2 (E.D.Wis. May 25, 2006). "On the other hand, '[t]he mere fact that men and women are both exposed to the same offensive circumstances on the job site . . . does not mean that, as a matter of law, their work conditions are necessarily equally harsh.' " *Petcou,* 2008 U.S. Dist. LEXIS 8885, at *24–25 (*quoting Petrosino v. Bell Atl.,* 385 F.3d 210, 221 (2d Cir. 2004)). *See also Kampmier v. Emeritus Corp.,* 472 F.3d 930, 940–41 (7th Cir.2007). As previously mentioned, the critical inquiry is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. Thus, the courts that have found that Title VII does

not cover the "equal opportunity" or "bisexual" harasser did so on the basis that members of one sex were exposed to identical disadvantageous terms or conditions of employment as the other sex. *Holman v. State of Indiana,* 24 F.Supp.2d 909, 913 (N.D.Ind.1998); *Donlow,* 2006 WL 1479548, at *2; *Fitzpatrick v. Winn–Dixie Montgomery, Inc.,* 153 F.Supp.2d 1303, 1305 (M.D.Ala.2001). However, that is not the case here.

■ In this case, plaintiff has presented sufficient evidence to establish that he was harassed based on his sex. "In order to establish a same-sex sexual harassment claim based [on] sexual desire, a plaintiff must offer credible evidence of the harasser's homosexuality." *EEOC v. Family Dollar Stores, Inc.,* Civil Action File No. 1:06–CV–2569–TWT, 2008 WL 4098723, at *13 (N.D.Ga. Aug. 28, 2008). It is undisputed that Pefanis is homosexual. [Doc. 83–3 ¶¶ 2–3; *Forsberg* Doc. 73–4 ¶ 6]. While there is evidence that Pefanis regularly groped both male and female employees, his alleged harassment of plaintiff was of a different character. Indeed, "[a] harasser may well make sexually demeaning remarks and putdowns to the plaintiff for sex-neutral reasons . . . but he is far less likely to make sexual advances without regard to sex." *La Day v. Catalyst Tech., Inc.,* 302 F.3d 474, 480 (5th Cir.2002) (emphasis omitted). Plaintiff's evidence shows that Pefanis used sex-specific language toward him by repeatedly propositioning plaintiff for sex and asking him if he had a big penis. [Doc. 83–3 ¶ 63; Doc. 83–4 at 6]. Pefanis regularly made statements such as "We should have sex," "I will make sure you enjoy it," and "Nice ass. Let's try it," and asked him if he was going to have sex with him. [Doc. 80–3 ¶ 86; Doc. 83–3 ¶¶ 52–53, 61–62, 76; Doc. 115 at 293, 323–31; Doc. 83–4 at 6–7]. Pefanis also grabbed plaintiff from behind,

forced himself against plaintiff with his pelvic area, pressing his crotch against plaintiff's buttocks, simulating anal sex. [Doc. 80–3 ¶ 84; Doc. 83–3 ¶ 55; Doc. 115 at 269–72].[13]

Plaintiff has presented evidence from which a reasonable factfinder could conclude that he was a victim of sexual advances by Pefanis based on sexual attraction to which members of the opposite gender were not subjected. *See Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir.2001) ("[W]hen a gay or lesbian supervisor treats a same-sex subordinate in a way that is sexually charged, it is reasonable to infer that the harasser acts as he or she does because of the victim's sex."); *McCoy v. Macon Water Auth.*, 966 F.Supp. 1209, 1217 (M.D.Ga. 1997) ("Because of the demand by the harasser for sexual gratification, the victim is singled out because of his or her gender. Thus, there is discrimination based upon the victim's sex in violation of Title VII.") (internal marks and citation omitted); *cf. Forsberg v. Pefanis*, Civil Action No. 1:07–CV–3116–JOF–RGV, 2009 WL 901015, at *7 (N.D.Ga. Jan. 26, 2009), adopted in part by *Forsberg v. Pefanis*, Civil Action No. 1:07–CV–3116–JOF, 2009 WL 901012, at *1 (N.D.Ga. Mar. 27, 2009). Here, while Pefanis may have harassed both male and female employees, plaintiff's evidence shows that the conduct directed at him was based on his sex since Pefanis allegedly repeatedly propositioned him for sex and inappropriately touched him on sever-

al occasions. Thus, plaintiff has made a showing that the alleged harassment he endured was based on his sex sufficient to survive summary judgment.

### (b) Severe or Pervasive

■■■■ The Eleventh Circuit has noted that the "severe or pervasive" requirement "is the element that tests the mettle of most sexual harassment claims." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir.2000), *abrogated on other grounds as recognized by Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir.2008) (citation omitted). "And, to be actionable under the statute, the Supreme Court has 'made it clear that [the] conduct must be extreme.'" *Banks v. San–J Int'l*, No. Civ.A. 3:00CV184, 2001 WL 34056053, at *3 (E.D.Va. Jan. 18, 2001) (*quoting Faragher*, 524 U.S. at 788, 118 S.Ct. 2275). "The determination of whether the alleged conduct is severe and pervasive, such that it altered the terms and conditions of plaintiff's employment" involves a two-pronged inquiry. *Burroughs v. Smurfit Stone Container Corp., LP*, 506 F.Supp.2d 1002, 1012 (S.D.Ala.2007). The Court must first determine whether the employee "subjectively perceived" the harassing conduct as severe and pervasive. *Id.* (citation omitted). If so, the Court must then consider whether the employee's perception is objectively reasonable. *Id. See also Parker v. Atlanta Newspapers Name Holding Corp.*, No. 05–15722, —— Fed. Appx. ——, ——, 2006 WL 1594427, at *2

---

**13.** Plaintiff contends that Pefanis sexually harasses males for his sexual gratification, whereas he harasses females to demean, degrade, and subordinate them because of his general hostility towards women. [Doc. 83–3 ¶¶ 4,7; *see also Forsberg* Doc. 73–4 ¶ 7]. Defendants assert that plaintiff has offered no evidentiary support for this contention, but, as the Court ruled in *Forsberg*, the nature of the conduct and comments Pefanis allegedly directed at his female employees as compared to the male employees tends to support plain-

tiff's contention. [Doc. 83–3 ¶¶ 2, 5–6, 8, 14, 17, 21–22, 25–26, 40, 43–44, 46–48, 52, 55, 60–62, 76; *Forsberg* Doc. 73–4 ¶¶ 6–7, 20–23; *Forsberg* Doc. 73–5 ¶¶ 4–7; *Forsberg* Doc. 73–6 ¶¶ 8–17; *Forsberg* Doc. 73–7 ¶¶ 3–7; Doc. 115 at 225–33, 239–43, 245–48, 251–54, 262–65, 269–72, 293, 303–10, 324–25, 332]. Pefanis made demeaning and humiliating comments about Forsberg's female anatomy, [*Forsberg* Doc. 73–4 ¶¶ 7–9, 18–19], whereas he repeatedly propositioned plaintiff for sex, [Doc. 115 at 303–10].

(11th Cir. June 12, 2006) (unpublished); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999); *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275. Thus, relevant inquiry is whether a reasonable person in plaintiff's position would find the harassment severe and pervasive. *Johnson*, 234 F.3d at 509.

The Eleventh Circuit has identified the following factors that should be considered in this analysis: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246 (citation omitted). Proof is not required on each factor individually as the Court employs a totality of the circumstances approach. *Hulsey*, 367 F.3d at 1248; *see also Dar Dar v. Associated Outdoor Club, Inc.*, 201 Fed.Appx. 718, 721 (11th Cir.2006) (unpublished); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Although [the Eleventh Circuit] examine[s] the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, the statements and conduct must be of a sexual or gender-related nature ... before they are considered in determining whether the severe or pervasive requirement is met." *Gupta*, 212 F.3d at 583 (citations omitted).

In analyzing the "sufficiently severe or pervasive" element of a sexual harassment case, "courts routinely remind plaintiffs that 'Title VII is not a federal civility code.'" *Breda v. Wolf Camera, Inc.*, 148 F.Supp.2d 1371, 1375 (S.D.Ga.2001) (quoting *Mendoza*, 195 F.3d at 1245); *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) ("[Title VII] is not designed to purge the workplace of vulgar-

ity."); *EEOC v. R & R Ventures*, 244 F.3d 334, 339 (4th Cir.2001) ("Boorish behavior may exist apart from any propensity to discriminate."). "This requirement is regarded 'as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory conditions of employment.'" *Breda*, 148 F.Supp.2d at 1375 (quoting *Oncale*, 523 U.S. at 81, 118 S.Ct. 998) (internal quotations omitted). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" will not amount to a hostile work environment. *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).

With these standards in mind, the Court turns to plaintiff's allegations. The Court accepts as true that plaintiff subjectively perceived the harassment to be severe and pervasive. Moreover, the Court finds that plaintiff's evidence also supports his claim that the alleged harassment was so objectively offensive that a reasonable person would have found it severe or pervasive. Plaintiff's claim is supported by Pefanis' alleged frequent sexually offensive conduct, including the following specific allegations pertaining to plaintiff:

- Pefanis' comments that plaintiff owed him sex in return for hiring him despite his criminal background. [Doc. 115 at 321, 324–27].

- Pefanis' comments to plaintiff on several occasions of "are we going to have sex or not" and "Let's do it," as well as comments that "we should have sex" and "I will make sure you enjoy it." [*Id.* at 293, 303–10, 324–25].

- Pefanis' comment to plaintiff that he had sex with plaintiff's supervisor and that his supervisor had a small penis that he wished was bigger. [*Id.* at 242–43, 245–46].

- Pefanis repeatedly asking plaintiff if he had a big penis. [Doc. 83-3 ¶ 63; Doc. 83-4 at 6].
- Pefanis' rubbing against plaintiff's body and commenting to plaintiff and plaintiff's supervisor that he wanted to have sex with both of them together. [Doc. 115 at 262-65].
- Pefanis' request at a closed-door team meeting as to whether "anyone [had] a penis [he could] put in [his] mouth." [Id. at 251-54].
- Pefanis' comment to plaintiff during a luncheon asking plaintiff if he even liked sex and talking about sex toys. [Id. at 332; Doc. 68 at 74-75].
- Pefanis' repeated touching of plaintiff by placing his hands on plaintiff's thigh and rubbing his hands back and forth on plaintiff's thigh and at least one incident of rubbing plaintiff's chest in the presence of other employees during a team meeting. [Doc. 115 at 239-42, 309-10].
- Pefanis' smacking plaintiff on the buttocks and stating, "Nice ass. Let's try it." [Doc. 83-3 ¶ 61; Doc. 83-4 at 6].
- Pefanis' grabbing plaintiff from behind and grinding his pelvic area against plaintiff's buttocks to simulate anal sex. [Doc. 115 at 269-72].

"Conduct that occurs every day weighs the frequency factor in the employee's favor." *Thornton v. Flavor House Products, Inc.*, No. 1:07-CV-712-WKW [WO], 2008 WL 5328492, at *9 (M.D.Ala. Dec. 19, 2008). Here, plaintiff's allegations regarding Pefanis' daily conduct in the office and the specific actions directed at plaintiff clearly meet the frequency factor. *Johnson*, 234 F.3d at 509; *Deel v. Metromedia Rest. Servs. Mgmt. Co., L.P.*, No. 3:05CV120/MCR, 2006 WL 897606, at *1, 11 (N.D.Fla. Apr. 3, 2006). As for severity, considering all of the circumstances taken together, including multiple sexual advances coupled with offensive physical touches, plaintiff's allegations are sufficient to establish a *prima facie* case and survive summary judgment. *Dar Dar*, 201 Fed. Appx. at 721-22; *Parker*, — Fed.Appx. at ——, 2006 WL 1594427, at *3; *Olson v. Lowe's Home Centers Inc.*, 130 Fed.Appx. 380, 388 (11th Cir.2005) (unpublished); *Hulsey*, 367 F.3d at 1247-49; *Dees v. Johnson Controls World Serv., Inc.*, 168 F.3d 417, 418, 422 n. 12 (11th Cir.1999); *Johnson*, 234 F.3d at 509; *Sullivan v. Lake Region Yacht & Country Club, Inc.*, 996 F.Supp. 1463, 1466-67 (M.D.Fla.1998).

Additionally, plaintiff has sufficiently established the third factor by showing that the conduct was both physically threatening and humiliating. Indeed, on at least two occasions, Pefanis grabbed plaintiff, rubbed his body against his, and on one of those occasions, simulated anal sex. [Doc. 115 at 262-65, 269-72]. Additionally, plaintiff has presented evidence that Pefanis' actions, which were often witnessed my members of defendants' management team or other employees, humiliated him. [Doc. 115 at 225-31, 234, 256, 264, 269-73, 293, 309-10, 332]. Under these facts, a reasonable employee in plaintiff's position would perceive Pefanis' conduct to be physically threatening and humiliating. *See Olson*, 130 Fed.Appx. at 388; *Hulsey*, 367 F.3d at 1248; *Johnson*, 234 F.3d at 509; *Jeffers v. Russell County Bd. of Educ.*, No. 3:06-cv-0685-WKW, 2008 WL 410621, at *9 (M.D.Ala. Feb. 13, 2008). Finally, plaintiff has shown that Pefanis' actions interfered with his job performance in that plaintiff was unable to concentrate on his job, often had to leave the office after an incident with Pefanis, and was ultimately terminated from his employment.

Defendants rely on *Mitchell v. Pope*, 189 Fed.Appx. 911, 913 (11th Cir.2006) (unpublished), *Mendoza*, 195 F.3d at 1247, and *Gupta*, 212 F.3d at 585, in support of their

argument that the conduct alleged here does not meet the severe or pervasive element of a sexual harassment claim. [Doc. 80–2 at 9–10]. In *Mitchell,* the plaintiff alleged that the harasser tried to kiss her after a Christmas party and called her a "frigid bitch" when she refused, made comments to plaintiff such as "you must be working out," "you sure do look fine," "your ass sure does look fine," and that she could "just walk into the room and [he gets] an erection," showed up on numerous occasions in her driveway, once drunk, telling her that he loved her, attempted to look down her shirt, rubbed up against her, chased her around the office, once picked her up, asked her in telephone conversations if she was dressed or naked, opened the women's bathroom door and turned the lights off when he knew plaintiff was inside, simulated "humping" another female employee with that employee's consent, made sexual comments and gestures about a female magistrate judge, referred to another employee in a derogatory manner, and asked plaintiff to go to a hotel hot tub with him when they were at a conference and called her a "frigid bitch" when she refused. 189 Fed.Appx. at 913.

In *Mendoza,* the plaintiff alleged that her supervisor constantly stared at her and followed her around, would "look [her] up and down ... in a very obvious fashion," stared at her groin area and made a sniffing motion on two occasions, rubbed his right hip against hers while touching her shoulder and smiling on one occasion, and commenting that he's "getting fired up, too" in response to plaintiff's statement that she "came in here to work." 195 F.3d at 1242–43. Additionally, *Gupta* involved allegations of conduct over a six or seven month period that included flirtatious comments such as "[you are] looking very beautiful"; frequent late-night calls to plaintiff's house asking personal questions; unbuckling his pants and tucking in his shirt in front of plaintiff; and one incident

where the harasser placed his hand on the plaintiff's inner thigh. 212 F.3d at 584–86.

In each of these cases, the Eleventh Circuit found that the conduct alleged fell short of the level of either severe or pervasive conduct, finding that much of the conduct was either not overtly sexual, involved mostly "offensive utterances," or that the more severe allegations were infrequent. *Mitchell,* 189 Fed.Appx. at 913; *Mendoza,* 195 F.3d at 1247–49; *Gupta,* 212 F.3d at 584–85. Indeed, there were only minor allegations of physical contact in these cases. In the present case, however, the sexual comments and physical touching alleged were far more frequent, severe, and threatening than the allegations in *Mitchell, Mendoza,* and *Gupta.*

The harassment alleged in this case is more akin to that alleged in *Johnson* and *Olson* than in the cases defendants rely on. In *Johnson,* the plaintiff alleged 15 incidents of unwelcome and harassing conduct that occurred over a four-month period, including sexually explicit comments and gestures, "giving [plaintiff] unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts." 234 F.3d at 506, 509. *Olson* involved allegations that the harasser, over a two and half month period, subjected the plaintiff to offensive and vulgar sexual comments several times a week, and touched her at least three times by attempting to kiss her on a single occasion and rubbing against her on two occasions. 130 Fed.Appx. at 388.

This case is also more analogous to *Dees* and *Splunge v. Shoney's, Inc.,* 97 F.3d 488 (11th Cir.1996), two cases defendants attempt to distinguish. [Doc. 80–2 at 8–9]. *Dees* involved allegations that defendants harassed plaintiff on a daily basis over a three-year period by making sexually explicit jokes, commenting on plaintiff's body, picking up plaintiff and squeezing

her, multiple propositions for sex, repeated incidents of grabbing and slapping plaintiff's buttocks and leg, and one incident where one defendant ground his groin into plaintiff's buttocks while stating "look at that sexy mama, I could just eat you in that skirt." 168 F.3d at 418, 422 n. 12. Similarly, *Splunge* involved allegations that four restaurant managers "grabbed [p]laintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored other employees who had affairs with them, [and] speculated as to the plaintiffs' sexual prowess." 97 F.3d at 490.

As in these cases, the present case involves frequent instances of verbal sexual harassment coupled with unwanted physical touching. In sum, plaintiff has alleged facts sufficient to show that his work environment was objectively hostile and abusive. *See Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 334 (6th Cir.2008) (finding male supervisor's continual, crass requests for oral sex, regularly rubbing against plaintiff with his private parts, and touching or grabbing her "every time" they worked together was sufficiently severe or pervasive to establish a hostile work environment claim); *McKinnis v. Crescent Guardian, Inc.*, 189 Fed.Appx. 307, 310 (5th Cir.2006) (finding that frequent unwanted touching, including touching on the breasts and thigh over a year-long period, repeated demands for "hugs and kisses," and other inappropriate behavior resulting in plaintiff's resignation, supported a hostile work environment claim); *Taylor–Rogers v. Robb & Stucky, Ltd.*, 82 Fed.Appx. 974, 975 (5th Cir.2003) (finding evidence that co-employee, among other things, rubbed up against plaintiff on a daily basis and had simulated a sex act with her was "sufficient to create a genuine issue of material fact as to the severity and pervasiveness of the harassment"); *EEOC v. Harbert–Yeargin, Inc.*, 266 F.3d 498, 508–09 (6th Cir.2001) (jury could find that supervisor's daily attempt to get close to employee and touching him whenever they were talking, stalking employee two or three times a day after employee was transferred, grabbing employee's private parts constitutes severe, physically threatening, and humiliating discriminatory conduct); *Williams v. Kansas City*, 223 F.3d 749, 753 (8th Cir.2000) (finding conduct consisting of a supervisor making frequent calls to the plaintiff, inviting her to train him on the weekend, staring at her body, and making sexually charged comments about penis size sufficiently severe or pervasive); *Hall v. Gus Const. Co.*, 842 F.2d 1010, 1012–14 (8th Cir.1988) (finding conduct involving crude names and other verbal abuse, requests to engage in sexual acts, offensive and unwelcome physical touching of thighs and breasts to be sufficiently severe or pervasive to support hostile work environment claim).[14] Accord-

14. Defendants rely on a number of cases from other districts to show that the conduct alleged here falls short of the severe or pervasive standard. [Doc. 80–2 at 10–13]. Defendants' reliance on these cases, however, is misplaced. The incidents described in those cases were only episodic, included no physical touchings or the physical touchings were not sufficiently severe, or the employer manifested unequivocally that it considered the charge a serious matter and took prompt remedial steps to address it. *See Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 872 (5th Cir.1999) (plaintiff admitted defendant never propositioned her, asked her out on a date, or suggested that he would like to sleep with her; that she had a friendly relationship with defendant in and out of work; and that the touching only included the rubbing of one of defendant's hands from plaintiff's shoulder to her wrist and then stopped once defendant was transferred to a different agency); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir.1999) (allegations included vulgar remarks found to be no more offensive than sexual jokes told on major television

ingly, the undersigned **RECOMMENDS** that defendants' summary judgment motion be **DENIED** as to plaintiff's Title VII sexual harassment hostile work environment claim.

### ii. Tangible Employment Action Sexual Harassment

■ Although defendants have made no specific argument with regard to plaintiff's tangible employment action sexual harassment claim, the Court will evaluate whether plaintiff has established a *prima facie* case since defendants have moved for summary judgment on plaintiff's sexual harassment claims. To establish a *prima facie* case of tangible employment action sexual harassment, plaintiff must show that (1) he belongs to a protected group; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) he suffered a tangible employment action; and (5) there is a "causal link between the tangible employment action and the sexual harassment." *Orquiola v. Nat'l City Mortgage Co.,* 510 F.Supp.2d 1134, 1151 (N.D.Ga.2007), adopted at 510 F.Supp.2d at 1141 (*citing Cotton,* 434 F.3d at 1231). *See also Lees v. Dynamic Educ. Sys., Inc.,* No. 3:06–cv–1106–J–33TEM, 2008 WL 821997, at *9 (M.D.Fla. Mar. 26, 2008) (*quoting Virgo v. Riviera Beach Assocs.,* 30 F.3d 1350, 1361 (11th Cir.1994)).

■ As previously discussed, plaintiff has presented sufficient evidence to establish the first and third elements of his *prima facie* case. The fourth element is also satisfied as plaintiff maintains that he suffered a tangible employment action because he was terminated from his employment after he refused to give in to Pefanis' sexual demands. [Doc. 1 ¶ 32]. Plaintiff has likewise satisfied the fifth element as there is a causal connection between the alleged harassment and his termination since it occurred within days of the last sexual proposition. Indeed, " 'temporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation....' " *Orquiola,* 510 F.Supp.2d at 1154 (*quoting Cotton,* 434 F.3d at 1232).

As for the second element, "[i]n order to constitute harassment ... [the] conduct must be 'unwelcome' in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Morgan v. Fellini's Pizza, Inc.,* 64 F.Supp.2d 1304, 1309 (N.D.Ga.1999). "In determining whether conduct was unwelcome, the nature of the sexual advances and the context in which they occurred are to be viewed in light of the totality of the circumstances at issue." *Id.* Plaintiff al-

networks and no touching); *Adusumilli v. City of Chicago,* 164 F.3d 353, 361–62 (7th Cir.1998) (allegations included isolated instances of coworkers' touching the plaintiff's arm, fingers, and a "relatively mild ... poke" in the buttocks); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) (allegations included two alleged incidents of hostile treatment in which a supervisor made a comment about the plaintiff's body and touched her breasts with some papers); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823 (6th Cir.1997) (allegations consisted of "merely offensive" comments made at bi-weekly meetings over a four-month period); *Hopkins v. Baltimore Gas and Electric Co.,* 77 F.3d 745, 753–54 (4th Cir.1996) (allegations included

ambiguous comments not specifically directed at plaintiff and incidents of bumping into plaintiff, giving plaintiff a congratulatory kiss at his wedding, positioning a magnifying glass over plaintiff's crotch, and staring at plaintiff in the bathroom); *DeAngelis v. El Paso Municipal Police Officers Ass'n,* 51 F.3d 591, 596 (5th Cir.1995) (allegations included four printed references to plaintiff over a two and a half year period in a company newsletter); *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993) (allegations included the supervisor asking plaintiff for a date, calling plaintiff names, putting his hand on plaintiff's shoulder, placing "I love you" signs in plaintiff's work area during one week, and attempting to kiss her in a bar).

leges that he was humiliated, embarrassed, and offended by Pefanis' actions, and that he told Pefanis to stop, but Pefanis ignored his requests. [Doc. 115 at 225–31, 242–43, 264, 272–73; Doc. 83–4 at 7].

The Court "at the summary judgment stage is not entitled to assess the credibility of the varying accounts of the events that took place between [p]laintiff and [Pefanis]." *Morgan*, 64 F.Supp.2d at 1310. Therefore, plaintiff's evidence is sufficient to establish a *prima facie* case that he experienced unwelcome incidents of sexual harassment and to survive defendant's motion for summary judgment. *Id.* at 1309–10 (evidence offered by plaintiff that she was disturbed and offended by harassers' conduct and asked them to desist sufficient to create a genuine issue of material fact as to whether the conduct was unwelcome).[15] Accordingly, the undersigned **RECOMMENDS** that summary judgment be **DENIED** as to plaintiff's tangible employment action sexual harassment claim.

### b. *Retaliation*

Defendants' argument for summary judgment on plaintiff's retaliation claim consists only of a single sentence asserting that the claim "fails because [plaintiff] cannot present any evidence beyond his own self serving testimony, that the reasons [defendants] have advanced for the termination of [plaintiff's] employment are anything other than legitimate, non-discriminatory reasons such that [plaintiff] cannot meet the required pretext showing to avoid dismissal of this claim." [Doc. 80–2 at 21]. "Such an unadorned, and seeming-

ly half-hearted, request for summary judgment hardly warrants consideration." *Donnelly v. Chicago Park Dist.*, 417 F.Supp.2d 992, 1000 (N.D.Ill.2006) (*citing Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir.2005) ("court need not scour record to locate support for party's argument; perfunctory or undeveloped arguments are waived")). *See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (There "is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). "This is especially the case here, where it is the [defendants] that bear[ ] the burden of demonstrating [they are] entitled to summary judgment." *Donnelly*, 417 F.Supp.2d at 1000. Notwithstanding defendants' perfunctory argument, the Court will address the merits of plaintiff's Title VII retaliation claim and whether he has shown pretext.[16]

 Defendants have failed to articulate in their motion a legitimate, non-retaliatory reason for the alleged adverse action, i.e., plaintiff's termination. However, based on the defendants' statement of undisputed facts, the Court infers that defendants contend that plaintiff was terminated because he failed to meet his sales quota after having been counseled on several occasions and after having been given a performance improvement plan. [Doc. 80–3 ¶¶ 10–11, 14–15; Doc. 81–4 ¶¶ 10–11; Doc. 81–5 ¶¶ 13–15]. Poor job performance is a legitimate, non-retaliatory reason on its face for terminating an employee. *See*

---

**15.** As noted earlier, defendants have only challenged whether plaintiff can establish a *prima facie* case of hostile work environment. To the extent defendants attempt to rebut plaintiff's *prima facie* case of tangible sexual harassment by arguing that they terminated plaintiff's employment for a legitimate, non-discriminatory reason, i.e., that plaintiff failed to meet his sales quota during his 90–day period of employment, this argument fails for

the reasons stated hereinafter in the discussion of plaintiff's retaliation claim.

**16.** Defendants make no argument as to whether plaintiff has established a *prima facie* case of retaliation. Therefore, for purposes of this motion, the Court presumes that plaintiff has established a *prima facie* case of retaliation.

*Cooper v. S. Co.*, 390 F.3d 695, 740 (11th Cir.2004), *overruled in part on other grounds by, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006).

■ If the employer articulates a legitimate, non-retaliatory reason for the termination, the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff. *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998). *See also Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir.1998). "In order to directly attack [a defendants'] reasons, [a plaintiff] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence.'" *Standard*, 161 F.3d at 1333 (third alteration in original) (*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997)).

■ Defendants presumably contend that Pefanis' motive for firing plaintiff was his failure to meet his sales quota during the 90–day period. Specifically, defendants assert in their statement of undisputed facts that plaintiff's monthly target was $750,000 for the first month of employment, between $1 million and $2 million for his second month, and between $2.5 million and $3 million for his third month. [Doc. 81–15 ¶ 37; Doc. 115, Ex. 12]. According to defendants, plaintiff only reached $245,000 his first month, $401,800 his second month, and $1,447,100 his third month. [Doc. 81–15 ¶¶ 38–41; Doc. 115, Ex. 12]. Defendants assert that during plaintiff's employment, they counseled him about his job performance, placed him on a performance improvement plan, and even warned him that if he did not improve his job performance, he could be terminated. [*Id.* ¶¶ 48–49; Doc. 81–4 ¶ 10; Doc. 81–5 ¶¶ 12–13]. Defendants' contentions must be evaluated against the entire record viewed in the light most favorable to plaintiff.

According to plaintiff, his minimum sales quota was to reach $1 million by the end of the 90–day period, which he contends he did as evidenced by the fact that he was paid a commission based on this quota. [Doc. 115 at 296]. Plaintiff points to his supervisor's testimony that he was guaranteed a base salary of $2,500.00, and after the 90–day period, the base salary would be eliminated and plaintiff would "earn commissions as follows: 25 basis points on the first million dollars of funded volume per month ... and 10 basis points on the funded dollar amount over the first $1,000,000 of monthly volume." [Doc. 81–15 ¶¶ 7, 34]. Plaintiff also contends that he never received any counseling about performance problems and was never given a performance improvement plan at any time during his employment with AME. [Doc. 115 at 295–96, 336–37]. Indeed, plaintiff points out that defendants have failed to produce any documentation evidencing such counseling or a performance improvement plan. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (fact that plaintiff "never received a negative written performance evaluation or formal warning, nor is there any writing whatsoever criticizing his job performance," indicates that poor job performance as the reason for termination was an afterthought).

Additionally, plaintiff contends that defendants' reason constitutes pretext because the evidence shows that the day after he rejected Pefanis' sexual proposition, plaintiff's supervisor told him that Pefanis wanted him gone but that he was

doing a good job, that his numbers looked good, and that Pefanis had no reason to let him go. [Doc. 115 at 292–96]. *See also McArdle v. Dell Products, L.P.,* 293 Fed. Appx. 331, 338 (5th Cir.2008) (*quoting Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 409 (5th Cir.1999) (" '[T]he combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.' ")). Moreover, plaintiff points out that a few days later when Abbott advised him that defendants were terminating his employment, Abbott acknowledged that plaintiff had reached his target goals while at AME. [*Id.* at 337].

■ Based on the disputed evidence in this case, the Court finds that there is a genuine issue of material fact as to what plaintiff's sales quota was during his 90–day period, whether he in fact met that quota, and whether he was ever counseled regarding any performance problems while employed with defendants. Furthermore, plaintiff has offered sufficient evidence from which a jury could infer that his alleged failure to meet his minimum sales quota during the 90–day period he was employed was a pretext for his discharge. *See Miller v. Patterson Motors, Inc.,* Civil Action No. 3:2007–33, 2009 WL 789897, at *23, 26 (W.D.Pa. Mar. 24, 2009) ("[T]he fact that [d]efendant did not inform [p]laintiff at the time she was discharged that her failure to meet a sales quota was the reason she was being terminated could give rise to an inference that the reason for her termination was discrimination [and/or retaliation, insofar as the evidence shows sufficient weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's preferred legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.]") (internal marks, citations, and emphasis omitted). Accordingly, it is **RECOMMENDED** that defendants' summary judgment motion as to plaintiff's retaliation claim be **DENIED.**

### 3. State Law Claims

#### a. *Negligent Hiring and Retention*

■ In Count Two of his complaint, plaintiff brings a negligent hiring and retention claim against AME and Georgia Mutual. [Doc. 1 ¶¶ 44–46]. Under Georgia law, an employer is "bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency." O.C.G.A. § 34–7–20. Liability for negligent retention requires evidence that the employer knew or reasonably should have known of the employee's propensity to engage in the type of conduct that caused injury to the plaintiff. *Middlebrooks v. Hillcrest Foods, Inc.,* 256 F.3d 1241, 1247 (11th Cir.2001) (applying Georgia law); *Munroe v. Universal Health Servs., Inc.,* 277 Ga. 861, 596 S.E.2d 604, 606 (2004). Thus, to prevail on this claim, plaintiff must produce evidence that AME and Georgia Mutual knew or reasonably should have known that Pefanis was engaging in sexual harassment. *Herron v. Morton,* 155 Fed.Appx. 423, 426 (11th Cir. 2005) (unpublished) (applying Georgia law); *Wynn v. Paragon Sys., Inc.,* 301 F.Supp.2d 1343, 1355 (S.D.Ga.2004); *Mangrum v. Republic Indus., Inc.,* 260 F.Supp.2d 1229, 1255 (N.D.Ga.2003); *Fowler v. Sunrise Carpet Indus., Inc.,* 911 F.Supp. 1560, 1585 (N.D.Ga.1996) (stating that "if an ordinarily careful employer, acting upon information furnished to it, reasonably could have discovered that its supervisor was sexually harassing its employees, the employer could be found to have negligently retained the supervisor"). *See also H.J. Russell & Co. v. Jones,* 250 Ga.App. 28, 550 S.E.2d 450, 453 (2001).

Defendants assert that AME and Georgia Mutual lacked knowledge of the conduct alleged in this case. [Doc. 80–2 at

13–15]. Specifically, defendants contend that AME and Georgia Mutual's alleged knowledge that Pefanis sexually harassed three female employees did not put them on notice that Pefanis would sexually harass male employees. [*Id.*]. Defendants' argument, however, overlooks plaintiff's evidence that Pefanis also allegedly sexually harassed several male employees prior to plaintiff's employment with defendants. [*Forsberg* Doc. 73–4 ¶ 6; *Forsberg* Doc. 73–6 ¶¶ 8, 11, 13–17; *Forsberg* Doc. 73–7 ¶¶ 3–5]. Additionally, plaintiff alleges that many of Pefanis' actions directed toward him were witnessed by members of defendants' management team or that management had knowledge of the actions based on plaintiff's complaints. [Doc. 115 at 234, 251–54, 256–59, 262–68, 272–73, 332]. Accordingly, the undersigned hereby **RECOMMENDS** that defendants' summary judgment motion as to plaintiff's state law claim for negligent hiring and retention be **DENIED.**

### b. *Intentional Infliction of Emotional Distress*

In Count Four of his complaint, plaintiff brings a claim of intentional infliction of emotional distress against defendants, alleging that the sexually offensive conduct to which he was subjected was "designed to inflict severe emotional distress upon [p]laintiff and did inflict severe emotional distress upon [p]laintiff." [Doc. 1 ¶¶ 53–54]. For an employee to prevail on a claim of intentional infliction of emotional distress under Georgia law, he must show that (1) the employer's conduct was extreme and outrageous; (2) the employer acted recklessly or intentionally; (3) the conduct of the employer caused emotional distress; and (4) the emotional distress was severe. *Trimble v. Circuit City Stores, Inc.*, 220 Ga.App. 498, 469 S.E.2d 776, 778 (1996); *Bridges v. Winn–Dixie Atlanta, Inc.*, 176 Ga.App. 227, 335 S.E.2d 445, 447–48 (1985).

Defendants seek summary judgment because, among other things, plaintiff alleges no specific emotional distress as a result of the harassment alleged in this case. Indeed, plaintiff points to no evidence demonstrating that he suffered severe emotional distress as a result of defendants' actions and fails to respond to defendants' argument regarding this element with the exception of noting it in a brief footnote. [Doc. 83 at 18 n. 10]. Even assuming that plaintiff satisfies the first three elements of his claim, he simply has not shown that any emotional distress he suffered was severe. *See Soloski v. Adams*, 600 F.Supp.2d 1276, 1371–72 (N.D.Ga.2009), adopted at 600 F.Supp.2d at 1322; *Pierri v. Cingular Wireless, LLC*, 397 F.Supp.2d 1364, 1382 (N.D.Ga.2005); *Quarles v. McDuffie County*, 949 F.Supp. 846, 855–56 (S.D.Ga.1996) (granting summary judgment where plaintiff produced no evidence beyond her own assertions to support her claim that she has suffered severe emotional distress). Accordingly, it is **RECOMMENDED** that defendants' summary judgment motion be **GRANTED** as to plaintiff's intentional infliction of emotional distress claim.

### c. *State Law Claim for Violation of O.C.G.A. § 34–2–10*

Finally, plaintiff asserts a claim for violation of O.C.G.A. § 34–2–10(a), which provides:

> Every employer shall furnish employment which shall be reasonably safe for the employees therein, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such an employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees.

Defendants contend that this claim should be dismissed because O.C.G.A. § 34–2–10 does not apply to sexual harassment claims, but only to physical conditions of the workplace. [Doc. 80–2 at 16–21]. In the *Forsberg* case, the Honorable J. Owen Forrester, Senior United States District Judge, ruled that O.C.G.A. § 34–2–10 "does not apply to sexual harassment in the workplace." *Forsberg*, 2009 WL 901012, at *1–2. Accordingly, it is **RECOMMENDED** that defendants' summary judgment motion as to this claim be **GRANTED.**

### B. *Plaintiff's Motion for Contempt and Sanctions*

Plaintiff moves for civil and criminal sanctions pursuant to Federal Rule of Civil Procedure 45(e) and 18 U.S.C. § 401, respectively, against non-parties Eckland, ARELG, and Jeffries, and attorney Ates, [Doc. 94], based on their failure to comply with this Court's October 30, 2008, Order, [Doc. 87], to produce any and all documents responsive to the August 11, 2008, Rule 45 subpoenas served upon Eckland, ARELG, and Jeffries, [Docs. 41–3, 41–4, & 43–3]. Ates, Eckland, and ARELG oppose plaintiff's motion. [Doc. 97]. Jeffries has failed to respond. For the following reasons, the undersigned hereby **RECOMMENDS** that plaintiff's motion, [Doc. 94], be **GRANTED** in part and **DENIED** in part.

### 1. Background

On July 18, 2008, plaintiff served identical Rule 45 subpoenas upon Eckland and ARELG. [Docs. 41–3 & 41–4]. Eckland is Pefanis' business associate, roommate, and partner, and the sole owner of AR-

ELG. [Doc. 36 at 1; Doc. 41–2 at 1]. Plaintiff specifically sought documents he contends are relevant to show: (1) defendants fraudulently transferred certain income and assets immediately after the filing of this and other lawsuits [Docs. 41–3 & 41–4],[17] (2) defendants paid witnesses for their testimony,[18] (3) Eckland is a co-employee or alter-ego of defendants and thus liable in this case, and (4) facts and circumstances surrounding Pefanis' sexual harassment in the workplace. [Doc. 44 at 3–9, 12; Doc. 41–2 at 3]. The subpoenas requested the production of documents related to twelve categories:

1. All financial records (including cancelled checks, check stubs, check registers, bank statements and other documents) that reflect any or all of the following:

 a. Payments to (or intended for the benefit of) Jock Barnes at any time since January 1, 2006;

 b. Payments to (or intended for the benefit of) Farrah Bowers at any time since January 1, 2006;

 c. Payments to any friend or family member of Farrah Bowers at any time since January 1, 2006;

 d. Payments made to any other individual who has been an employee of [AME] and/or [Georgia Mutual] at any time since January 1, 2006; and/or

 e. Payments made at the request of [Pefanis] or any officer, director or employee of [AME] and/or [Georgia Mutual].

---

**17.** Specifically, plaintiff contends that just hours before Pefanis' deposition in this case, Pefanis transferred millions of dollars worth of real property to Eckland for no consideration. [Doc. 44 at 4]. Plaintiff contends that Eckland then began mortgaging certain prop-erty in an effort to "rob it of all of its equity value." [*Id.* at 5].

**18.** Plaintiff claims that Pefanis and Eckland provided monetary incentives to at least one witness, Farrah Bowers, in exchange for favorable testimony. [Doc. 44 at 5–9].

2. All financial records (including cancelled checks, check stubs, check registers, bank statements and other documents) that reflect any disbursement or present whereabouts of the proceeds of the mortgage, in the approximate amount of $150,000, taken out on the property located at 2362 River Ridge Road, Martin, GA.

3. All financial records (including cancelled checks, check stubs, check registers, bank statements and other documents) that reflect any disbursement or present whereabouts of the proceeds of any mortgage taken out by [Eckland] on any property transferred to [Eckland] by [Pefanis] at any time since June 1, 2007. This includes, but is not limited to, the following properties.

 a. 6835 Matt Hwy, Cumming, GA

 b. 101 McLeoad Farm Road, Dawsonville, GA

 c. 28 McLeod Farm Road, Cumming, GA

 d. 2290 Winthrope Way Drive, Alpharetta, GA

 e. 53 26th Street, NW, Atlanta, GA

 f. 1740 Corsica Drive, Wellington, FL

 g. 2362 River Ridge Road, Martin, GA

4. All financial records (including cancelled checks, check stubs, check registers, bank statements and other documents) that reflect the identity of any bank or other financial account maintained by [Pefanis].

5. All documents reflecting the identity and/or location of any real property owned by [Pefanis, AME and/or Georgia Mutual] at any time since January 1, 2007.

6. All documents reflecting the employment of Jimmy Partain and/or Jimmie Partain, including any documents reflecting the reasons for the departure of Mr. Partain.

7. All documents reflecting any sexual assault, or alleged sexual assault, on Mr. Partain.

8. All documents reflecting any report (including any complaint) by any employee of [ARELG] that [Pefanis] engaged in any inappropriate racial, sexual or other conduct or that he engaged in any unprofessional conduct.

9. Documents identifying the gross revenue paid to [ARELG] by [AME] and/or [Georgia Mutual] since January 1, 2007.

10. Documents identifying the gross revenue received by [ARELG] as a result of providing legal services with respect to mortgages financed by [AME] and/or [Georgia Mutual] since January 1, 2007.

11. Documents reflecting reports made by [ARELG] to [AME] and/or [Georgia Mutual] regarding legal services performed for third-parties.

12. Documents reflecting or relating to payments by [AME] and/or [Georgia Mutual] to individuals or entities because such individuals or entities utilized [ARELG] (or referred others to utilize [ARELG]).

[Docs. 41–3 & 41–4].

On the same day, plaintiff also served a Rule 45 subpoena on Jeffries,[19] seeking, among other things, financial statements and records for Pefanis, AME, and Georgia Mutual as enumerated in sixteen paragraphs. [Doc. 43–3]. On July 31, 2008, defendants moved to quash plaintiff's sub-

---

19. Jeffries is defendants' accounting firm that prepared the audited financial statements.

[Doc. 43–2 at 3–4].

poenas to Eckland and ARELG, [Doc. 37], and on the same day, Eckland and ARELG filed an objection to the subpoenas, [Doc. 38]. Jeffries did not move to quash the subpoena, nor did it comply with the subpoena. Thereafter, plaintiff moved to enforce the subpoenas issued to Eckland, ARELG, and Jeffries. [Docs. 41 & 43].

On October 30, 2008, the Court issued an Order addressing, among other things, these subpoenas. [Doc. 87]. In the Court's Order, it specifically found that paragraphs 1 through 8 of the subpoenas to Eckland and ARELG "target information relevant to the issues presented in this case and are properly limited to the purposes identified by plaintiff," and ordered Eckland and ARELG to produce to plaintiff any and all documents responsive to those paragraphs within 15 days from the October 30 Order. [*Id.* at 14–15]. This Court, however, found that the documents sought in the remaining paragraphs of the subpoenas to Eckland and ARELG were "too attenuated from the claims presented ... and [were] not relevant to any issues in this case." [*Id.* at 15]. With regard to the subpoena issued to Jeffries, the Court found that the documents were "clearly relevant to [plaintiffs'] damages claims and will shed light on defendants' net worth which is discoverable information." [*Id.* at 16]. Therefore, the Court ordered Jeffries to produce all responsive documents within 15 days from the October 30 Order. [*Id.* at 17].

On November 14, 2008, Ates, as counsel for Eckland and ARELG, sent an email to plaintiff's counsel with an attached letter in response to the subpoenas issued to Eckland and ARELG and purportedly in compliance with the Court's October 30 Order. [Doc. 94–5]. Plaintiff, however, takes issue with Eckland and ARELG's responses to paragraphs 2 through 5 of the subpoenas. [Doc. 94]. Specifically, with regard to paragraphs 2 and 3 of the sub-

poenas issued to Eckland and ARELG, Ates, on Eckland and ARELG's behalf, responded "see attached," and Ates attached a small subset of documents allegedly responsive to those paragraphs. [Docs. 94–5 & 94–6]. With regard to paragraph 4, Ates answered, "Responding with the understanding that the Court's Order denied plaintiffs access to the defendants', Eckland's and ARELG's SunTrust and Wachovia Bank Account Records—There are no other responsive documents." [Doc. 94–5 at 2 (all caps omitted)]. Finally, with regard to paragraph 5, Ates responded, "NONE." [*Id.*]. Jeffries failed to comply with this Court's October 30 Order, or to respond in any way. Therefore, plaintiff filed the present motion for sanctions for civil and criminal contempt against Eckland, ARELG, Ates, and Jeffries. [Doc. 94]. On January 27, 2009, the undersigned held a hearing and afforded the parties and their counsel an opportunity to present arguments and evidence regarding plaintiff's motion. [Doc. 104; *see also* Doc. 103 at 2]. Therefore, this motion having been briefed and argued is now ripe for ruling.

## 2. Standard

██ Federal Rule of Civil Procedure Rule 45 "permits a party to procure discovery from a non-party through the issuance and service of a subpoena." *Hernandez v. Tregea*, No. 2:07–cv–149–FtM–34SPC, 2008 WL 3157192, at *3 (M.D.Fla. Aug. 4, 2008). "Indeed a properly issued and served subpoena provides a court with jurisdiction over a non-party witness within the court's territorial jurisdiction with respect to the discovery requested in the subpoena." *Id.* Rule 45(e) "provides that the issuing court 'may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena.' A subpoena issued on behalf of the court should be treated as a court order." *De-*

*Volk v. JBC Legal Group, P.C.,* No. 8:04–CV–1275–T30–EAJ, 2008 WL 1777740, at *1 (M.D.Fla. Apr. 18, 2008) (*quoting* Fed. R.Civ.P. 45(e)).[20]

"There are two types of contempt, civil and criminal. Civil contempt is a process used by a Court to compel compliance with a subpoena or court order. Criminal contempt is penal in nature and requires compliance with the protections that the Constitution requires in criminal proceedings." *Bray & Gillespie Management LLC,* 2008 WL 4371345, at *3. "A contempt fine ... is considered civil and remedial if it either coerce[s] the [contemnor] into compliance with the court's order, [or] ... compensate[s] the complainant for losses sustained." *Id.* (internal marks and citation omitted) (alteration in original).

 "Courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Old Nat'l*

*Bank v. Goldberg & Assocs., LLC,* No. 08–80078–CIV, 2009 WL 813019, at *2 (S.D.Fla. Mar. 23, 2009).[21] "In a contempt action, the moving party must prove by clear and convincing evidence that (1) a valid court order was in effect; (2) the order was clear and unambiguous; and (3) the alleged violator could have complied with the court's order, had he chosen to do so." *Taylor v. Teledyne Technologies, Inc.,* 338 F.Supp.2d 1323, 1345–46 (N.D.Ga. 2004) (citations omitted). *See also Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir.1990) (citations omitted). "However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a present inability to comply that goes beyond a mere assertion of inability." *Howard Johnson Co.,* 892 F.2d at 1516 (internal marks and citations omitted). "Therefore, the focus of the court's inquiry

**20.** "While 'the Federal Rules do not explicitly provide an avenue to sanction attorneys who fail to comply with discovery orders .... there is no doubt' that a court may exercise its inherent powers to sanction discovery abuses and to discipline attorneys who engage in obstructive behavior." *Blackwell v. St. Charles Parish,* Civil Action No. 05–2105, 2009 WL 586179, at *3 (E.D.La. Mar. 5, 2009) (*quoting Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.,* 2 F.3d 1397, 1410–11 (5th Cir.1993)). "The inherent powers of federal courts are those which 'are necessary to the exercise of all others.'" *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (internal marks and citation omitted). "The most prominent of these is the contempt sanction, which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court." *Id.* (internal marks and citation omitted). Therefore, "deeply rooted in the common law tradition is the power of any court to manage its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Carlucci v. Piper Aircraft Corp., Inc.,* 775 F.2d

1440, 1447 (11th Cir.1985) (internal marks and citation omitted). *See also Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (courts may sanction party or attorney who shows bad faith); *Bray & Gillespie Management LLC v. Lexington Ins. Co.,* No. 6:07–cv–222–Orl–98KRS, 2008 WL 4371345, at *4 (M.D.Fla. Sept. 22, 2008) ("Courts ... have the inherent power to sanction parties, lawyers, or both for engaging in conduct that abuses the judicial process.").

**21.** Pursuant to 28 U.S.C. § 636, where an act constitutes a civil contempt, "the magistrate judge shall certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question ... an order requiring such person to appear before a district judge ... to show cause why that person should not be adjudged in contempt by reason of the facts so certified." 28 U.S.C. § 636(e)(6)(B)(iii). Thereafter, "[t]he district judge shall ... hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge." *Id.*

in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Id.* "Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance." *Id.*

 " 'The role of criminal contempt is to protect the institutions of our government and enforce their mandates. A federal court may impose criminal sanctions pursuant to 18 U.S.C. § 401 ... to vindicate its authority and safeguard it own processes.' " *E.A. Renfroe & Co., Inc. v. Moran,* 508 F.Supp.2d 986, 995 (N.D.Ala. 2007) (*quoting In re McDonald,* 819 F.2d 1020, 1023–24 (11th Cir.1987)) (footnote omitted). "The essential elements of criminal contempt are that the court entered a lawful order of reasonable specificity, it was violated, and the violation was wilful." *McDonald,* 819 F.2d at 1024. "Whether the order is reasonably specific is a question of fact and must be evaluated in the context in which it is entered and the audience to which it is addressed." *Id.* (internal marks and citation omitted). "In criminal contempt, willfulness means a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *Id.* (internal marks and citations omitted). "Each of these elements must be proven beyond a reasonable doubt in order to determine guilt and impose punishment." *Id.*

### 3. Discussion

 In the present case, Eckland and ARELG appeared through their counsel, Ates, and were subject to the Court's October 30, 2008, Order. The evidence before the Court shows that with regard to paragraph 4 of the subpoenas issued to Eckland and ARELG, Ates, on behalf of Eckland and ARELG, failed to respond as ordered by the Court. In his brief and at the hearing, Ates, admitted that the response given was by his own choice and not that of Eckland or ARELG, and argued that because the Court granted defendants' motion to quash subpoenas issued to Wachovia, SunTrust, Colonial, National City, Wells Fargo, and CitiMortgage banks, [Doc. 87 at 9–10, 17–19], that Eckland and ARELG were not required to produce to plaintiff any bank records. [Doc. 97 at 8–10].

Specifically, Eckland and ARELG state in their brief that "producing the bank records associated with this account would be exactly inconsistent with the Court's ruling quashing the subpoenas that were served on the Banks for these same bank records." [*Id.* at 10]. Ates' argument, however, overlooks the fact that there was no conflict in the Court's October 30 Order as the Court specifically found the subpoenas issued to the banks to be overbroad, but that the subpoenas to Eckland and ARELG were narrowly tailored. [Doc. 87 at 11, 14, 18–19]. Indeed, the Court, in quashing plaintiff's subpoenas to Wachovia and SunTrust banks, made clear that "the Court does not intend to preclude all discovery of the non-parties [and defendants'] finances ... but ... cannot permit such unrestricted access to defendants', Eckland's and ARELG's bank accounts, which goes beyond the limited purposes identified by plaintiff." [*Id.* at 11 (internal marks and citation omitted) ]. In direct contrast, the Court found that the documents sought in the subpoenas issued directly to Eckland and ARELG were properly limited to the purposes identified by plaintiff. [*Id.* at 14]. There is nothing inconsistent about the Order, and the Court finds that Eckland and ARELG, by and through Ates, failed to comply with the October 30, 2008, Order.

With regard to paragraphs 2 and 3 of the subpoenas issued to Eckland and AR-ELG, plaintiff asserts that Eckland testified that he "obtained a $150,000 mortgage on the transferred River Ridge property and then spent approximately $125,000 of this amount to pay his personal bills to creditors." [22] [Doc. 94–2 at 10]. Plaintiff further asserts that Eckland maintained that he had records that would list all of these creditors. [*Id.* at 11]. However, plaintiff contends that Eckland and AR-ELG only produced five documents that show that ARELG had debits of $6,400 that were used to pay credit card bills to unspecified accounts of Pefanis, Eckland, or ARELG, and that all but $700 of these payments were dated after Eckland's July 1, 2008, deposition such that only $700 could relate to the debt payment Eckland claimed he had made with a portion of the $125,000. [*Id.*]. Finally, plaintiff contends that the remaining documents produced by Eckland and ARELG show that Eckland paid a personal credit card bill in the amount of $21,000 and purchased two horses for $80,000 from ARELG's "Lawyer Trust Account," which shows that only $21,700 of the $125,000 was used to pay credit cards and other debts, and that Eckland lied in his deposition when he stated that he only used $10,000 for expenses relating to horses he already had. [*Id.* at 11–12 & n. 2].

At the hearing, Ates stated that he relied on discussions with Eckland in responding to paragraphs 2 and 3 of the subpoenas and did not conduct his own independent review. [Doc. 104]. While Ates also cites to Eckland's deposition testimony to refute plaintiff's contentions, a review of Eckland's testimony shows that

he testified that he used $125,000 of the $150,000 mortgage to pay off credit cards and other bills. [Doc. 66 (Eckland Dep.) at 69–70, 72–74]. Eckland further stated that he did not remember all of the creditors but could get the list of creditors he paid his debt to as he had those records in his possession. [*Id.* at 75]. Yet, Eckland has produced only five documents that show that ARELG paid off debts totaling $6,400. [Doc. 94–2 at 11]. Thus, it is apparent that Eckland did not produce all of the documents he testified were in his possession and were sought in paragraphs 2 and 3 of the subpoenas. To the extent Eckland had in his possession or had the ability to obtain responsive documents, he was required to produce those documents to plaintiff. By failing to do so, he failed to comply with the Court's October 30 Order.

Finally, with regard to paragraph 5 of the subpoenas, plaintiff contends that Eckland and ARELG's response of "NONE" for documents reflecting the identity and/or location of any real property owned by Pefanis, AME, or Georgia Mutual since January 1, 2007, is directly contradicted by Eckland and Pefanis' testimony that Eckland had the deeds to at least seven properties that fell within the request. [Doc. 94–2 at 13]. At the hearing, Ates, acknowledging that the argument he made in his brief in opposition was incorrect, conceded that they did not produce any documents in response to paragraph 5 even though responsive documents exist. Indeed, Ates agreed that Pefanis owned with Eckland the properties listed in paragraph 3 of the subpoena with Eckland until June 2007 such that documents relating to those properties would be responsive to para-

---

**22.** As previously stated, paragraph 2 requested documents reflecting any disbursements or present whereabouts of the proceeds of the mortgage, in the approximate amount of $150,000, taken out on a certain piece of real

property. [Docs. 41–3 & 41–4]. Paragraph 3 requested the same information with regard to any property Pefanis transferred to Eckland at any time since June 1, 2007. [*Id.*].

graph 5. Therefore, to the extent that such documents had not already been produced, Ates agreed to produce those documents to plaintiff on the same day of the hearing, January 27, 2009.

Based on the foregoing, plaintiff has sufficiently established a *prima facie* case that Eckland, ARELG, and Ates failed to comply with the Court's October 30, 2008, Order, by failing to produce responsive documents to paragraphs 2 through 5 of the subpoenas issued to Eckland and ARELG. The burden having shifted, Ates, Eckland, and ARELG failed to produce sufficient evidence to explain their non-compliance. Moreover, the evidence shows that the failure to respond to paragraphs 2 and 3 lies directly with Eckland and ARELG whereas the failure to respond to paragraphs 4 and 5 lies directly with Ates. Thus, plaintiff has established a basis to certify this matter for civil sanctions against Eckland, ARELG, and Ates. Moreover, Jeffries' failure to comply with the Court's October 30, 2008, Order directing it to produce responsive documents within fifteen days from that Order, and its failure to offer any explanation for its noncompliance with the Order, also provides a basis to certify the matter for civil contempt sanctions against Jeffries.[23] Accordingly, it is **RECOMMENDED** that plaintiff's motion for sanctions, [Doc. 94], be **GRANTED** in part and **DENIED** in part, and pursuant to 28 U.S.C. 636(e), the undersigned hereby certifies the foregoing facts to the District Judge and respectfully **RECOMMENDS** that a show cause order be issued requiring Ates, Eckland, ARELG, and Jeffries to appear and show cause why they should not be adjudged in contempt. *See Cadles of Grassy Meadows II, LLC v. Swift,* No. 2:07–mc–10–FtM–

99DNF, 2007 WL 4171149, at *1 (M.D.Fla. Sept. 10, 2007).

## III. CONCLUSION

For all of the foregoing reasons, the undersigned **GRANTS** defendants' motion for leave to file summary judgment exhibits out of time, [Doc. 81], and **RECOMMENDS** that defendants' motion for partial summary judgment, [Doc. 72], and plaintiff's motion for civil and criminal contempt and for sanctions, [Doc. 94], be **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED** and **RECOMMENDED,** this 10th day of July, 2009.

---

**23.** While civil contempt sanctions against Ates, Eckland, ARELG, and Jeffries are recommended for their failure to comply with the Court's October 30, 2008, Order, criminal contempt sanctions are not recommended in this case.